**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION**

| | | |
|---|---|---|
| PETER BIRKHOLZ., | ) | CV-09-51-BLG-RFC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER DENYING MOTIONS** |
| | ) | **FOR SUMMARY JUDGMENT** |
| BILLINGS CLINIC, NORTH | ) | |
| BIGHORN HOSPITAL DISTRICT | ) | |
| and JOHN NESS, Individually, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

Peter Birkholz filed the instant action claiming his service in the Wyoming

National Guard was a "motivating factor" in his termination as CEO of North Big

Horn Hospital, in violation of the Uniformed Services Employment and

Reemployment Rights Act ("USSERA"), 38 U.S.C. § 4301.  Pending before the

Court are Defendants' motions for summary judgment.  *Docs. 63 & 66.*[1]  After an

_____

[1]In its initial motion and brief, Defendant North Big Horn Hospital District informed the
Court that it joined in Defendant Billings Clinic's motion and brief and adopted verbatim all the
arguments made by Billings Clinic. *Docs. 66 & 67.*  Accordingly, this Order treats both

1

extensive review of the facts and applicable law, the Court concludes there are factual issues in this case that can only be resolved by a trial.

## II.  FACTUAL BACKGROUND

Defendant Billings Clinic is Billings, Montana-based integrated, nonprofit health care organization that manages and operates health care providers in the region.  Defendant North Big Horn Hospital ("NBHH") operates health care facilities in Lovell, WY.  Billings Clinic manages NBHH pursuant to the Management Services Agreement ("MSA") entered into in 2003.  Under the MSA, Billings Clinic provides a CEO to NBHH, subject to approval of the NBHH Board of Trustees.  The NBHH is an employee of Billings Clinic and reports to its COO, as well as the NBHH Board.  The NBHH CEO is evaluated by Billings Clinic and NBHH at least every twelve months.

Birkholz became employed by Billings Clinic as the CEO of NBHH on August 15, 2005.  When Birkholz was hired in 2005, Defendant John Ness was the

---

Defendants' motions as if they are one.  In its reply brief, NBHH makes the argument that it is not Birkholz's employer and it did not terminate him, but no such argument was made in any previous filing.  Since "[i]t is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers," the Court does not address whether NBHH should be dismissed from this action.  *United States ex rel. Giles v. Sardie*, 191 F.Supp.2d 1117, 1127 (C.D.Cal. 2000).

Vice President of Clinical and Regional Operations at Billings Clinic. Ness was promoted to Chief Operating Officer on February 1, 2006, where he remained until August, 2010. As COO, Ness was responsible for the operations of Billings Clinic. He provided executive leadership for managed affiliates such as NBHH and directly supervised Birkholz.

From 2005 to 2010, Kyle Gee was Billings Clinic's Executive Director/Chief Financial Officer of Regional Operations. Gee's responsibilities included working with Birkholz on business initiatives and work performance, as well as overseeing NBHH and interacting with the NBHH Board of Trustees regarding Birkholz's performance.

When he was hired by Billings Clinic, Birkholz was a member of the Army Reserve, a fact known to Ness and Gee at the time. Birkholz went on civilian break from the Reserves in October of 2006.

Billings Clinic uses what it calls a "360 Degree Performance Evaluation System" for CEO's employed at facilities for which it has MSAs. This system uses the individuals who work with the CEO–the governing board members, staff, and physicians–to evaluate CEO performance. The CEO also submits his own evaluation of his performance as part of this process.

The "360 Degree Performance Evaluation System" evaluates CEO's on a scale of 1 to 5 in nine categories: (1) Leadership and Development; (2) Personal Service; (3) Teamwork; (4) Job Skill Set; (5) Problem Solving; (6) Fiscal Management; (7) Communication; (8) Community Service; and (9) Ethics. The numbers on the rating scale in the evaluation system have the following meanings: "1" means "Does Not Meet Minimum Standards;" "2" means "Usually, But Not Always, Meets Expectations;" "3" means "Consistently Meets Expectations;" "4" means "Frequently Exceeds Expectations;" and "5" means "Consistently Exceeds Expectations."

In addition to the numerical evaluations, evaluators are asked to provide written comments in each of the nine categories and additional written comments at the end of the evaluation. The results and comments of the evaluations are tabulated and compiled into a performance evaluation summary, which includes all supporting comments, numerical scores, average scores, and average scores from previous evaluations.

During his time as NBHH CEO, Birkholz received four performance evaluations. In his first, August, 2006, evaluation, Birkholz gave himself a "5" in all nine categories, although the staff average was 3.18, 4.33 from physicians, and

3.44 from the board. Although there were many positive comments, some of the negative comments indicated that Birkholz was a poor listener, did not like to be questioned, ignored problems, and was gone a lot. As a result of the August 2006 Performance Evaluation, Ness told Birkholz that he needed improvement in the following areas: (1) follow-up on projects and questions; (2) better communication with staff, management and the board; (3) increase availability and exposure to staff and residents; and (4) spend more time listening and soliciting ideas. After this review, Birkholz received a $3000 salary increase and a performance bonus of $4000, out of a maximum possible performance bonus possible of $5000.

In December of 2006, Birkholz was subject to a six month follow-up review because Billings Clinic wanted to keep a close track of his performance due to some negative comments in the first evaluation. Birkholz received an average score of 3.3 from staff, 4.09 from physicians, and 2.9 from the board. As with the previous evaluation, there were negative comments concerning his leadership abilities.

In a January 8, 2007 email on another matter, Birkholz informed Ness and Gee that he was enlisting in the Wyoming National Guard. Birkholz had not informed anyone prior to joining because he did not believe it was any of their

business.  Soon after this email, Ness and Birkholz had a telephone discussion during which Ness was angry at Birkholz.  Although Birkholz claims Ness was upset because of the difficulties and expense his military service would cause, Ness denies being upset about him joining the Guard.  Ness claims he was upset because Birkholz joined without telling anyone.  According to Ness, there was concern at the time about Birkholz's available as CEO and his lack of communication with the Board.  Ness further avers he had directed Birkholz to keep Dexter Woodis, the Chairman of the NBHH Board, informed about the activities that made him unavailable to the Board and employees of NBHH and this failure to inform Woodis before joining the Guard indicated that Birkholz was refusing his directive.

Nonetheless, on February 1, 2007, Ness wrote a letter to the NBHH advising that they enter into a three year employment contract with Birkholz and that NBHH increase his salary to be more consistent with executives at other rural hospitals.  Although Ness recognized that there "had been some concern about communication and overall style issues from Peter's management team and from selected Board members," he also stated that it was not all Birkholz's fault, and that he recommended that the NBHH management team undergo a six month

6

Leadership Development Program.  Ness also stated that Billings Clinic believed Birkholz was willing to commit to his position and improve his communication and leadership skills and that further turnover in leadership would be a detriment to NBHH.

In February of 2007, Ness reviewed the results of Birkholz's December 2006 evaluation with the NBHH Board.  Although the Board agreed to increase Birkholz's annual salary to a more competitive $105,000, and also to increase his potential performance bonus from $5,000 to $15,000, the Board was concerned about Birkholz's "communication style, follow-up, and team building."  At the same time, both Billings Clinic and the NBHH Board were "committed to [Birkholz's] continuing role as CEO" even though they felt "it will be necessary for [him] to exhibit strong efforts to improve [his] personal leadership and communication style ..."

On April 17, 2007 Ness met with Birkholz regarding his performance as CEO, relaying the need for improvement Ness had discussed with the NBHH Board in February.  Ness further informed Birkholz that Billings Clinic had developed a Leadership Development Program for him that would be coordinated by Carlos Acre, Billings Clinic's Director of Organizational and Leadership

Development, and John Poore, a professional leadership coach. Billings Clinic would pay one-half the $10,000 cost of the program and NBHH would pay the other half. The program would last eight to ten months and would involve sessions with the coaches, Birkholz, and the NBHH management team, as well as individual sessions for Birkholz.

On May 14, 2007, Birkholz requested military leave from July 8, 2007 to July 21, 2007.[2] He reminded them of this leave, and also that he would be gone from July 26 to August 1, on June 15, 2007.

In August of 2007, Birkholz was again evaluated. The average rating from physicians was 3.7, 3.9 from the NBHH Board, and 3.3 from the management team. There were negative comments concerning Birkholz's leadership ability, but no comments concerning his absences for military service.

Gee shared the results of Birkholz's August 2007 evaluation with the NBHH Board in a letter dated November 19, 2007. Gee reiterated that the "recent CEO turnover has contributed to broader management and organizational

---

[2]The document Birkholz attaches to his Statement of Genuine Issues ("SGI") as evidence of this requests a leave of absence from "7-8-07" to "7-21-08." *Doc. 75, ex. 11.* The text of Birkholz's SGI states that "Birkholz requested military leave for July 8 to July 21, 2008." Doc. 75, ¶ 14. Since the next paragraph of his SGI, mentioned "July 7 to July21, 2007," *doc. 75, ¶ 15*, and the request was made in 2007, the Court assumes the 2007 date is correct.

problems" and, "[i]n the interest of stability [Billings Clinic and NBHH]," Gee

concluded "it would be beneficial to work with Mr. Birkholz and NBHH's

management team to create a better working relationship and to improve Mr.

Birkholz's performance." Gee also said Birkholz's recent evaluation identified

"continuing concerns including the need for Mr. Birkholz to build a strong

management team, improv[e] communication with the board of directors and

management team, and more thorough processing of critical decisions." Gee's

letter also informed the NBHH Board that Birkholz would continue to work with

Arce and Poore to improve his performance and that Billings Clinic would

continue to mentor Birkholz with feedback from the NBHH Board. Finally, Gee

said that the salary increase from the April 2007 evaluation had been implemented

and that no additional increase in salary was necessary until the next evaluation in

August of 2008.[3]

At some time around Christmas 2007, Birkholz learned that his National

Guard unit would be deployed to Iraq or Kuwait for approximately a year in the

---

[3]Birkholz avers that he received a $14,000 raise and a potential performance bonus of $15,000 on August 15, 2007, but this contradicts Gee's November 19, 2007 letter. Birkholz supplies no documentary evidence of this except for his own affidavit. It is most likely that the raise Birkholz refers to was the same raise identified in April 2007, which became effective July 1, 2007.

spring or summer of 2009.  By February of 2008, Birkholz had told Ness, Gee, and

the NBHH Board of his likely deployment and he reminded the Board again in

March 2008 meeting of the NBHH Board.  Ness avers that he was not concerned

about the deployment because Billings Clinic had people available who could

serve as interim CEO in Birkholz's absence.  On February 21, 2008, Birkholz

requested military leave for July 22 to August 9, 2008, which he later attended.

He also attended military training in California from April 7 to April 20, 2008.

In July of 2008, Birkholz was again evaluated pursuant to Billings Clinic's

360 Degree Performance Evaluation System.  Ness avers this evaluation was the

worst he had ever seen for an executive.  Birkholz received a 2.6 average rating

from the NBHH Board, 2.9 from physicians, and 2.5 from the NBHH management

team.  The evaluation summary contained numerous negative comments

concerning Birkholz's leadership skills, in addition to negative comments

concerning Birkholz's absence from work for the National Guard, meetings, and

personal time off.  NBHH Board member Linda Neville testified that she made

unfavorable comments concerning Birkholz's inability to perform sufficient

community service because of his military commitments.

On July 14, 2008, Ness and Birkholz discussed the evaluation.  Ness told

Birkholz the Board may ask him to resign and that Birkholz needed to think about the evaluation and the changes he needed to make in his personal style and performance in order to keep his job. A few days previous, Birkholz told the NBHH CFO that his evaluation had come back poor, admitting he had lost credibility with most of the management team and that the Board may ask him to resign. Birkholz further stated that he understood because he had "been somewhat disinterested of late" and had been looking for other work, but had no offers. Birkholz admitted that he needed to "make some pretty dramatic changes" and that the Board expected him to improve.

Ness discussed the recent evaluation with the NBHH Board on July 15, 2008. Despite the poor evaluation, Ness recommended that Birkholz not be terminated, but that he be placed on a 90-day performance improvement plan. The Board agreed.

On July 21, 2008, Ness and Birkholz signed the performance improvement plan. The plan made clear that Birkholz's performance over the last year was unsatisfactory and significant and immediate improvement was required. Birkholz was required to commit to improvement in specific performance areas within 90 days (1) Work Habits, Availability and Visibility; (2) Management Team

Development; (3) CEO Role and Responsibility; and (4) Board Communications and Relations. As part of the performance improvement plan, Billings Clinic retained Larry Putnam to evaluate, assist, and coach Birkholz during the 90-day period. Putnam has 25 years experience as an administrator of small, rural hospitals. The plan expressly warned Birkholz that failure to meet expectations by the end of the 90-day period could result in further discipline, including termination. Further, the plan warned that failure to exhibit immediate improvement could result in additional disciplinary action, including termination, during the 90-day improvement period. Finally, the plan deferred a decision on salary adjustments until October 31, 2008.

As part of the performance improvement plan, in mid-August 2008 Putnam spent six days at NBHH interviewing Birkholz, Board members, physicians, and members of the leadership team. On August 21, 2008, Putnam submitted an initial report discussing the results of his interviews and identifying specific problem areas with Birkholz's performance: (1) lack of availability; (2) communication issues with the Board; (3) lack of engagement while in the NBHH facility; (4) not listening to others; and (5) avoiding confrontation.

With regard to availability, Putnam said that every person he met with said

Birkholz was not available enough or accessible enough as CEO and that Birkholz was only at NBHH seven days between the July 2008 and August 2008 Board meetings.  Putnam also said Gee had shown him a spreadsheet showing that Birkholz was absent 28.5% of the time over the past year.  Significantly, Putnam's report did not criticize Birkholz for absences due to his military service, although there were many comments about Birkholz's general unavailability.  For example, Putnam cited comments from people stating "Peter has to go to every conference," "Peter takes too much time off," Peter's absences really hurt him," Peter "runs over to his house a lot to take care of personal business," and "Peter needs to come to work by 8:30 so he's here to help us with problems."  Putnam strongly urged Birkholz to put some time in at NBHH and show up to work by 8:30.

Putnam's August 21, 2008 report also relayed other specific concerns with Birkholz's performance, such as his lack of leadership and listening skills, and provided Birkholz with specific suggestions for improvement so he could demonstrate progress to the Board: (1) be present and available at NBHH for the next two months and come to work by 8:30 a.m.; (2) have a monthly, informal meeting with the chairman of the Board and the chief of the medical staff over lunch to discuss ongoing issues; (3) send an email message with an update

13

regarding what is happening at NBHH; (4) take notes during meetings and use those notes to set objectives and goals; (5) take a few minutes each day to set priorities on the use of time that day; (6) do rounds at NBHH, meaning get out and talk to direct-care personnel and support staff, at least once a week; (7) listen better and act on what you hear; and (8) stand up to the medical staff and back up your department managers when employees try to do an end run around them. Putnam concluded by encouraging Birkholz to contact him for advice until his return to NBHH in September.

When Birkholz discussed the August 21, 2008 report with Putnam, he explained that much of his 28.5% unavailability over the last year was due to military obligations and that the reason he was only available 7 days in July and August 2008 was because was undergoing additional military food service training in California. Birkholz also testified that the chart does not accurately account for military obligations what would be listed as personal time off.

Putnam continued to evaluate Birkholz at NBHH and the Billings Clinic Leadership and Trustee Conference during September 2008. Putnam also spoke with additional medical providers and Board members during this period, and attended an NBHH Board meeting. They also discussed Birkholz's performance

during this time. Putnam visited NBHH again on October 8-10, 2008 and had further discussions with Birkholz regarding his performance.

Putnam finalized his report on October 12, 2008, eleven days after Birkholz announced that he would be deployed to Kuwait for one year in April of 2009. Putnam evaluated Plaintiff's performance using eight categories Birkholz had recommended for merit bonuses for NBHH employees: (1) Quality of Work; (2) Quantity of Work; (3) Job Knowledge; (4) Dependability; (5) Decision Making; (6) Communications; (7) Initiative; and (8) Interpersonal Skills. Putnam rated Birkholz on a scale of 1 to 5 in each of these categories: 1 = Much Less Than Acceptable; 2 = Less Than Acceptable; 3 = Acceptable; 4 = More Than Acceptable; and 5 = Much More Than Acceptable. His report also contained a discussion supporting each rating given, with specific examples of Birkholz's performance.

Putnam summarized his review of Birkholz's performance as "marginal," noting that he "hasn't shown much improvement" since Putnam began working with him. As to the numbers, Putnam rated Birkholz's performance as follows: Quality of Work = 2; Quantity of Work = 2; Job Knowledge = 3; Dependability = 2; Decision Making = 1; Communications = 2; Initiative = 2; and Interpersonal

Skills = 2.  Although Putnam never directly criticizes Birkholz for absences caused by his National Guard service, the report makes clear that Birkholz's unavailability was a serious problem.  For example, Putnam states:

> After pointing out to Peter ... that all stakeholder groups at NBHH felt his lack of availability at the hospital was his biggest problem, I was disappointed he still asked Jon Ness to attend Wyoming CAH, Hospital Association and "Greehouse" meetings.  It seems like he's still interested in spending large chunks of time away from NBHH.  Also, after indicating to him that his staff felt he should get to work no later than 8:30 a.m., I observed him show up ... at the Billings Clinic Leadership & Trustee Conference ... at 9:05 a.m. (35 minutes after the scheduled start time).  Then, he immediately started asking questions ... that had been covered in the first 35 minutes of the presentation.

The one time Putnam did refer to Birkholz's military service, it was in reference to Birkholz's poor handling of his upcoming deployment.  Specifically, Putnam noted that when Birkholz announced his upcoming deployment, he told one member of his leadership team, "I'm going to be deployed and I'm not going to worry about any of this stuff [referring to his work as hospital CEO]."  Putnam further remarked that this, and other "I-don't-really-care" comments to the leadership team were "troubling."[4]  Putnam

_____

[4]In his SGI (*doc.* 75, ¶ 34) Birkholz implies that Putnam was criticizing Birkholz for his military service with his reference to Birkholz's "I-don't-really-care" comments, but a review of the report makes clear that Putnam is criticizing Birkholz for his handling of the deployment, not for the fact of the deployment.

also noted that although "attendance and availability had improved a little recently, ... one board member expressed to me in September she felt Peter would revert to too much time away from the hospital after this 90-day monitoring period."

Other than that he "is a likeable person," the most positive thing Putnam had to say about Birkholz, is that he "appears to have adequate job knowledge." This is consistent with the "3" rating Putnam gave Birkholz in the "Job Knowledge" category–his highest rating and the only rating above "2." Other negative comments include, "I have real concerns about the quality of the CEO work Peter is performing at NBHH," "I'm concerned about Peter's poor judgment," and "Peter is not highly engaged. He seems to be barley engaged or even somewhat disengaged at times." Putnam's report refers several times to an instance when Birkholz had the NBHH attorney review legal contracts that had already been executed. When the attorney questioned him about this, Birkholz responded that the attorney didn't need to review them anyway because he had completed one year of law school. That same attorney commented that he was the attorney for 16 public boards in Wyoming and Birkholz was the worst CEO for following up on requests by board members. Finally, consistent with Putnam's belief that Birkholz has "poor judgment and lack of sensitivity to others and poor interpersonal skills," Putnam's report makes clear that Birkholz did not listen to

people, but interrupts and talks over them.

On October 16, 2008, Ness, Gee, Putnam, Woodis, and Brett Crosby, who would replace Woodis as Chairman of the NBHH Board, held a conference call to discuss Putnam's report and Birkholz's performance. The participants had previously received Putnam's report and Putnam explained his findings. They also discussed a self-evaluation Birkholz had submitted the day before. The participants decided to present Putnam's report to the NBHH Board during an October 21, 2008 meeting.

On October 21, 2008, NBHH Board, along with Ness and Gee, met in executive session to review and discuss Putnam's report. Ness and Gee recommended that Birkholz be terminated. The NBHH Board agreed.

The next day, Ness and Gee told Birkholz he was being terminated as CEO because the NBHH Board had no confidence in his leadership abilities. Birkholz's last day at work would be October 24, after which he was put on paid administrative leave while they negotiated a termination agreement. Putnam was named interim CEO while Billings Clinic searched for a permanent replacement for Birkholz.

On November 21, 2008, Birkholz was formally terminated from employment with Billings Clinic. The reason for Birkholz's termination was listed as "ongoing

performance problems and a lack of confidence in his leadership abilities."  Despite

being terminated, Birkholz received $7900 of his potential $15,000 performance

bonus for 2007-08.

At some point during his employment with Billings Clinic, Birkholz nominated

Ness for a "My Boss is a Patriot" Award from the Montana Committee for

Employer Support of the Guard and Reserve.  Ness received this award on February

2, 2009.

## III.  ANALYSIS

### A.  SUMMARY JUDGMENT STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of

law."  Fed.R.Civ.P. 56(c)(2).  An issue is "genuine" only if there is a sufficient

evidentiary basis on which a reasonable fact finder could find for the nonmoving

party and a dispute is "material" only if it could affect the outcome of the suit under

the governing law.  *Anderson, v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment has the initial burden of showing the

absence of a genuine issue of material fact.  *Anderson*, 477 U.S. at 256-57.  Once

the moving party has done so, the burden shifts to the opposing party to set forth

specific facts showing there is a genuine issue for trial. *In re Barboza*, 545 F.3d

702, 707 (9th Cir. 2008). The nonmoving party "may not rely on denials in the

pleadings but must produce specific evidence, through affidavits or admissible

discovery material, to show that the dispute exists." *Id.*

On summary judgment, the evidence must be viewed in the light most

favorable to the non-moving party. *Id.* The court should not weigh the evidence

and determine the truth of the matter, but determine whether there is a genuine

issue for trial. *Anderson*, 477 U.S. at 249.

### B. USERRA

USERRA prohibits discrimination against persons because of their military

service. 38 U.S.C. § 4311(a). An employer violates USERRA if a "person's

membership, application for membership, service, application for service, or

obligation for service in the uniformed services is a motivating factor in the

employer's action, unless the employer can prove that the action would have been

taken in the absence of such membership, application for membership, service,

application for service, or obligation for service." 38 U.S.C. § 4311(c)(1).

USERRA was enacted in 1994 to strengthen the protections afforded by the

Vietnam Era Veterans Readjustment Assistance Act of 1974 by making clear that discriminatory actions against military personal are prohibited if the employee's military status is a "motivating factor" in the decision, even if military status is not the only factor. *Leisek v. Brightwood Corp.,* 278 F.3d 895, 898 (9th Cir. 2002). Birkholz has the burden of showing, by a preponderance of the evidence, that his military status was a substantial or motivating factor in the adverse employment action; Billings Clinic may then avoid liability only by showing, as an affirmative defense, that it would have taken the same action without regard to Birkholz's military service. *Leisek,* 278 F.3d at 899.

Birkholz cites a district court decision from Texas stating that the "term 'motivating factor' means that if the employer was asked at the moment of the decision what its reasons were and if it gave a truthful response, one of those reasons would be the employee's military position or related obligations." *Robinson v. Morris Moore Chevrolet-Buick, Inc.,* 974 F.Supp. 571, 576 (E.D.Tx. 1997) *citing Price Waterhouse v. Hopkins*, 490 U.S. 228, 250, (1989) (addressing Title VII gender discrimination claim and related affirmative defense). According to *Robinson*, Birkholz's military service was a motivating factor in Defendants's decision to terminate him if they relied upon, took into account, considered, or

conditioned its decision on his military-related absences. *Id.*

Defendants argue that pursuant to a recent decision of the U.S. Supreme Court, Birkholz must show more than that they relied upon, took into account, considered, or conditioned their decision on his military-related absences. In *Staub v. Proctor Hospital,* the Court construed the phrase "motivating factor in the employer's action," as that phrase is used in USERRA, 38 U.S.C. § 4311(c)(1). The *Staub* Court was determining whether the employer is potentially liable under USERRA for the discriminatory actions of employees who did not make the ultimate decision to terminate the plaintiff, but who placed a discriminatory report in the plaintiff's personnel file that was later used as the basis for termination by the ultimate decision-maker. 131 S.Ct. 1186, 1191 (2011). In ultimately holding that "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA," the Court remarked as follows:

> When a decision to fire is made with no unlawful animus on
> the part of the firing agent, but partly on the basis of a report
> prompted (unbeknownst to that agent) by discrimination,
> discrimination might perhaps be called a "factor" or a "causal
> factor" in the decision; but it seems to us a considerable

stretch to call it "a motivating factor."

> *Staub,* 131 S.Ct. at 1192

Defendants cite this passage as proof that the *Staub* Court held that a motivating factor under USERRA is more than simply a factor or even a causal factor in the adverse employment action. While the statement is true, one need only look to the language of the statute to know that a *motivating* factor is more than just a "factor" or a "casual factor." The passage cited by Defendants is not essential to *Staub's* holding. If anything this dicta merely limits *Robinson* to holding that Birkholz's military service was a motivating factor in Defendants's decision to terminate him if they relied upon or conditioned its decision on his military-related absences, rather than merely took it into account or considered it. *Robinson,* 974 F.Supp. at 576. In the Court's view, the meaning of the term "motivating factor" is plain and *Robinson* generally comports with that meaning.

Defendants argue it must be granted summary judgment on Birkholz's sole claim because Birkholz cannot prove his military service was a motivating factor in the decision to terminate his employment, and even if he could, Billings Clinic would have terminated him anyway. Birkholz responds that genuine issues of

material fact preclude summary judgment and he has made a sufficient factual

showing to present his case to a jury.

### C. THERE ARE GENUINE FACTUAL ISSUES AS TO WHETHER BIRKHOLZ'S MILITARY SERVICE WAS A "MOTIVATING FACTOR" IN HIS TERMINATION

According to Birkholz, the direct and circumstantial evidence shows he was

terminated because of absences due to his military obligations. Defendants argue,

on the other hand, that Birkholz was terminated for his poor performance as CEO

and for lack of improvement once Billings Clinic committed to improving his

performance through Putnam's 90-day improvement plan. The question on

summary judgment is whether there is sufficient evidence from which a rational

jury could conclude that Birkholz's military service was a motivating factor in his

termination. *See Robinson,* 974 F.Supp. at 576. As the following demonstrates,

the answer is yes, although it is a "close call."

Birkholz notes that his first couple evaluations were primarily positive and

made no mention of his military service until 2008, after he had joined the

Wyoming National Guard and given notice that he would be deployed for a year.

The record supports this assertion. In the August, 2006 evaluation, both the staff

and the NBHH Board rated Birkholz as "consistently meeting expectations." Even

better, the physicians ranked him as "frequently exceeding expectations."

Although there is no evidence in the record regarding how much time Birkholz

was away from NBHH due to military service–Birkholz had not yet joined the

Wyoming National Guard, but he was in the Army Reserve from his hiring in

August 2005 until October 2006–there were no negative comments concerning his

military service.  Birkholz also notes that received a $3000 raise after this review

and $4000 out of a possible $5000 performance bonus.

Similarly, in the December 2006 follow-up evaluation, the staff rated

Birkholz as "consistently mseeting expectations," and the physicians ranked him

as "frequently exceeding expectations."  Although the NBHH Board average

rating technically resulted in a "usually, but not always meets expectations" score,

the NBHH Board average was barely in the lesser category, at an average rating of

2.9.  Again, although there does not appear to be a complete record of all the

comments as there was for the first evaluation, there are no negative comments

concerning Birkholz's military service.  Moreover, there are no negative

comments concerning Birkholz's working hours or his absence from the facility.

The record is also undisputed that Ness was angry with Birkholz in a

telephone conversation after Birkholz notified him that he was joining the

Wyoming National Guard.  Ness claims he was upset because Birkholz joined without telling anyone, but Birkholz testified at his deposition that Ness was upset because Billings Clinic would have to give Birkholz time off and pay the difference between his salary and what the National Guard pays him, at the same time they have to pay someone else to do his job.  Although a reasonably jury could side with Ness, since he recommended in February of 2007 that Birkholz be given a three year contract and that his salary be increased to be more in-line with rural hospital executives, and also because Birkholz nominated Ness for the "My Boss Is A Patriot" award, the jury could infer a discriminatory motive from Birkholz's account of their conversation.  This factual dispute is precisely why judgment as a matter of law is premature for Defendants on this issue.

In the August of 2007, roughly eight months after Birkholz enlisted in the National Guard, he was evaluated again.  This time, the average rating from all three groups indicated Birkholz "consistently met xxpectations" under Billings Clinic's Performance Evaluation System.  Although there were no negative comments concerning absences due to military service, there is no evidence in the record of any absences due to military service at this time.  It is also clear that Defendants had some issues with Birkholz's leadership abilities and performance

as CEO, since they required Birkholz to continue with the Leadership Development Program run by Carlos Arce and John Poore.

In 2008, the negative references to Birkholz's military service first appear. By February of that year, Ness, Gee, and the NBHH Board were all aware that Birkholz would be deployed for a year. Further, Birkholz was gone for training from April 7-20 and again from July 22 to August 9.

Birkholz's July 2008 evaluation was the worst Ness had ever seen for an executive. The average rating of all three groups was "usually, but not always meets expectations." The evaluation contains several negative comments concerning his military service and his absence due to military service. After the July 2008 evaluation, Putnam was hired to implement the 90-day improvement plan.

Birkholz announced on October 1, 2008 that he would be deployed for one year beginning in April 2009. Eleven days later, Putnam issued his final report, which was very critical of Birkholz's "marginal" performance as CEO. Although the report, did not expressly criticize Birkholz for his absences due to military duties, the report made clear that Birkholz's availability was a serious problem. Defendants relied on this report to terminate Birkholz, three weeks after he

announced his upcoming deployment.

Although there is plenty of evidence from which a jury could conclude that Birkholz was terminated for his poor leadership skills, rather than his unavailability due to military service, Birkholz need only show there is sufficient evidence from which a jury could find in his favor. He has met that burden.

### D. FACTUAL ISSUES ALSO PRECLUDE SUMMARY JUDGMENT ON DEFENDANTS' AFFIRMATIVE DEFENSE

Having concluded that genuine issues of material fact preclude summary judgment that Birkholz's military service was not a motivating factor in his discharge, the inquiry turns to whether it can be said as a matter of law that Defendants would have discharged Birkholz regardless of his service in the Wyoming National Guard. *Robinson,* 974 F.Supp. at 576. To be granted summary judgment, Defendants must establish it as an uncontroverted fact that Birkholz would have been terminated despite his National Guard service. *Leisik,* 278 F.3d at 900. Again, although a reasonable jury could easily find for Defendants, the Court may not weigh the evidence. Its task is to determine if there is a genuine issue for trial.

Defendants note there were issues with Birkholz's performance long before

he joined the Wyoming National Guard in January of 2007. Specifically, Defendants cite the fact that just months after the December 2006 performance review, Birkholz was subject to a follow-up review because Billings Clinic wanted to keep a close track of his performance. This second review was conducted in December of 2006, before they knew Birkholz would be joining the National Guard, and long before they knew how his military service would affect his availability. But while Defendants label these reviews as "mediocre," Billings Clinic's own evaluation system scored Birkholz as "consistently meeting" or "frequently exceeding" expectations.

Moreover, the evaluations make clear that Birkholz had these same "performance problems" throughout, but even as late as July 2008, after the evaluation revealed that Birkholz "usually, but not always met expectations," Ness did not recommend that Birkholz be terminated. Ness recommended that Birkholz be placed on the 90-day improvement plan. It was not until October of 2008, after Birkholz announced that he would be deployed in April 2009 with certainty, that Ness, Gee, and the NBHH Board decided to terminate him. Under these facts, summary judgment is premature.

**IV.** **ORDER**

For those reasons, **IT IS HEREBY ORDERED** that Defendants' motions

for summary judgment (*docs. 63 & 66*) are **DENIED.**

Dated this 27th day of May, 2011.

                    __/s/Richard F.Cebull_
                    Richard F. Cebull
                    United States District Judge